## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OKLAHOMA

1) JUERGEN KRUEGER, Individually and )
   on Behalf of All Others Similarly )
   Situated, )
   )
   Plaintiff, )
   )   Case No. 17-cv-00161-GKF-TLW
   v. )
   )   **CLASS ACTION COMPLAINT FOR**
1) ONEOK PARTNERS, L.P., )   **VIOLATIONS OF SECTIONS 14(a)**
2) TERRY K. SPENCER, )   **AND 20(a) OF THE SECURITIES**
3) JOHN W. GIBSON, )   **EXCHANGE ACT OF 1934**
4) MICHAEL G. HUTCHINSON, )
5)  GARY N. PETERSEN, )   **JURY TRIAL DEMANDED**
6) JULIE H. EDWARDS, )
7) JIM W. MOGG, )
8) CRAIG F. STREHL, and )
9) STEVEN J. MALCOLM, )
   )
   Defendants. )

## COMPLAINT

Plaintiff Jeurgen Krueger ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

### NATURE OF THE ACTION

1.     This action is brought as a class action by Plaintiff on behalf of himself and the other public unitholders of ONEOK Partners, L.P. ("ONEOK Partners" or the "Partnership") against ONEOK Partners and the members of the board of directors of the general partner of the Partnership (collectively, the "Board" or "Individual Defendants," and, together with ONEOK Partners, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. 240.14a-9, and Regulation G, 17 C.F.R. § 244.100, in connection with the proposed merger between ONEOK Partners and ONEOK, Inc.

2.      On January 31, 2017, ONEOK Partners announced that it had entered into an Agreement and Plan of Merger ("Merger Agreement"), pursuant to which ONEOK, Inc. will acquire all of the outstanding common units representing limited partner interests in ONEOK Partners that ONEOK, Inc. and its subsidiaries do not already own, and New Holdings Subsidiary, LLC will be merged with and into ONEOK Partners, with ONEOK Partners surviving as a wholly owned subsidiary of ONEOK, Inc. (the "Proposed Transaction").

3.      Pursuant to the terms of the Merger Agreement, ONEOK Partners unitholders will receive 0.985 of a share of common stock of ONEOK, Inc. for each ONEOK Partners common unit they own (the "Merger Consideration").  Based on the closing price of ONEOK, Inc. common stock on March 27, 2017, the implied value of the Merger Consideration is approximately $51.71 per ONEOK Partners common unit.

4.      On March 7, 2017, in order to convince ONEOK Partners unitholders to vote in favor of the Proposed Transaction, the Board authorized the filing of a materially incomplete and misleading joint proxy statement/prospectus (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.

5.      In particular, the Proxy contains materially incomplete and misleading information concerning: (i) financial projections for the Partnership and ONEOK, Inc.; and (ii) the valuation analyses performed by the financial advisor to the conflicts committee of the Board, Barclays Capital Inc. ("Barclays") in support of its fairness opinion.

6.      The special meeting of ONEOK Partners unitholders to vote on the Proposed Transaction is forthcoming.  It is imperative that the material information that has been omitted from the Proxy is disclosed to the Partnership's unitholders prior to the forthcoming unitholder vote so, that they can properly exercise their corporate suffrage rights.

7.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, and Rule 14a-9 and Regulation G, 17 C.F.R. § 244.100.   Plaintiff seeks to enjoin Defendants from holding the unitholder vote on the Proposed Transaction and taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to the Partnership's unitholders sufficiently in advance of the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

9.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

10.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) The Partnership maintains its primary place of business in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here

and engaging in numerous activities that had an effect in this District.

## PARTIES

11.     Plaintiff is, and at all relevant times has been, a unitholder of ONEOK Partners.

12.     Defendant ONEOK Partners is a Delaware limited partnership headquartered in Tulsa, Oklahoma.  The Partnership owns an interstate pipeline system that transports natural gas primarily in the upper Midwest and Mid Continent regions of the United States.

13.     Individual Defendant Terry K. Spencer is, and has been at all relevant times, the president and chief executive officer of ONEOK Partners and ONEOK, Inc. and a member of the ONEOK Partners Board.

14.     Individual Defendant John W. Gibson is, and has been at all relevant times, the non-executive chairman of the board of ONEOK, Inc., ONEOK Partners, and ONE Gas, Inc.

15.     Individual Defendant Michael G. Hutchinson is, and has been at all relevant times, a member of the ONEOK Partners Board.

16.     Individual Defendant Gary N. Petersen is, and has been at all relevant times, a member of the ONEOK Partners Board.

17.     Individual Defendant Julie H. Edwards is, and has been at all relevant times, a member of the ONEOK Partners Board.

18.     Individual Defendant Jim W. Mogg is, and has been at all relevant times, a member of the ONEOK Partners Board.

19.     Individual Defendant Craig F. Strehl is, and has been at all relevant times, a member of the ONEOK Partners Board.

20.     Individual Defendant Steven J. Malcolm is, and has been at all relevant times, a member of the ONEOK Partners Board.

## CLASS ACTION ALLEGATIONS

21.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public unitholders of ONEOK Partners (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

22.     This action is properly maintainable as a class action because:

a.     The Class is so numerous that joinder of all members is impracticable.  As of February 21, 2017, there were approximately 212.84 million ONEOK Partners common units outstanding, held by hundreds to thousands of individuals and entities scattered throughout the country.  The actual number of public unitholders of ONEOK Partners will be ascertained through discovery;

b.     There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i)      whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the Proxy in violation of Section 14(a) of the Exchange Act;

ii)     whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iii)    whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their units regarding the

Proposed Transaction based on the materially incomplete and misleading Proxy.

c.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.     A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

**I.     ONEOK Partners' History And Recent Financial Performance**

23.     ONEOK Partners was founded in 1993 and is headquartered in Tulsa, Oklahoma. The Partnership engages in the gathering, processing, storage, and transportation of natural gas in the United States.  It operates through three segments: Natural Gas Gathering and Processing, Natural Gas Liquids, and Natural Gas Pipelines.  The Natural Gas Gathering and Processing segment gathers and processes natural gas produced from crude oil and natural gas wells located

in the Mid-Continent region, and gathers and processes natural gas in the Williston Basin. The Natural Gas Liquids segment gathers, treats, fractionates, and transports natural gas liquids (NGLs), as well as stores, markets, and distributes NGL products primarily in Oklahoma, Kansas, Texas, New Mexico, and the Rocky Mountain region. This segment also owns the Federal Energy Regulatory Commission (FERC)-regulated NGLs gathering and distribution pipelines in Oklahoma, Kansas, Texas, New Mexico, Montana, North Dakota, Wyoming, and Colorado; terminal and storage facilities in Missouri, Nebraska, Iowa, and Illinois; and FERC-regulated NGLs distribution and refined petroleum product pipelines in Kansas, Missouri, Nebraska, Iowa, Illinois, and Indiana. The Natural Gas Pipelines segment owns and operates regulated natural gas transmission pipelines and natural gas storage facilities, and provides natural gas transportation and storage services. This segment's interstate natural gas pipeline assets transport natural gas through FERC-regulated interstate natural gas pipelines in North Dakota, Minnesota, Wisconsin, Illinois, Indiana, Kentucky, Tennessee, Oklahoma, Texas, and New Mexico. It also transports intrastate natural gas through its assets in Oklahoma, and owns underground natural gas storage facilities in Oklahoma, Texas, and Kansas. ONEOK Partners GP, L.L.C. serves as the general partner of ONEOK Partners.

24.     The Merger Consideration ONEOK Partners unitholders stand to receive if the Proposed Transaction is consummated appears inadequate in light of the Partnership's recent financial performance. Specifically, the Partnership has announced strong financial results over the past several quarters.

25.     On November 1, 2016, the Partnership announced the following impressive financial results for the third-quarter 2016: net income attributable to ONEOK Partners and adjusted earnings before interest, taxes, depreciation and amortization (adjusted EBITDA)

increased 21 and 16 percent, respectively, compared with the third quarter 2015; natural gas volumes processed increased 13 percent and natural gas liquids (NGL) volumes fractionated increased 3 percent, compared with the third quarter 2015.

26.     Commenting on the strong financial results, Individual Defendant Terry K. Spencer stated:

> ONEOK Partners continues to post strong financial results and expects to finish 2016 in line with financial guidance. Third-quarter 2016 results benefited from increased natural gas volumes gathered and processed and higher NGL volumes fractionated from recently connected natural gas processing plants and increased ethane recovery compared with last year. The natural gas liquids segment expects to benefit from a ramp up in volumes at the five third-party natural gas processing plants connected to our system in 2016 and from the segment's competitive asset position in active shale plays such as the STACK and SCOOP plays in Oklahoma. We expect increased producer drilling in these plays through the remainder of the year and into 2017, and continue to expect a favorable impact from ethane recovery across our system as new petrochemical facilities come online during the year. Our Bear Creek natural gas processing plant was completed in August and is currently 50 percent utilized, contributing to expected fourth-quarter Williston Basin volume growth in the natural gas gathering and processing segment. Through October 2016, we've seen the completion of large multi-well pads in the Mid-Continent, specifically in the STACK play, supporting our expectation for a year-end volume ramp up in the segment and setting the stage for additional volume growth in 2017. In our natural gas pipelines segment, we've been successful in our strategy to move markets closer to supply. In October, we completed the second phase of the joint venture Roadrunner Gas Transmission Pipeline and the complementary ONEOK WesTex expansion project, connecting markets in Mexico with upstream supply basins in West Texas and the Mid-Continent. Both projects were completed ahead of original schedules and below cost estimates and are expected to provide the partnership with stable, long-term fee-based earnings. The partnership's balance sheet remains healthy and we continue to reduce our leverage position. Financially and operationally, we're in a strong position, and we have the flexibility to take advantage of opportunities to create additional shareholder value.

27.     Most recently, on February 27, 2017, the Partnership announced the following impressive financial results for the fourth quarter and full-year 2016: Full-year 2016 net income attributable to ONEOK Partners and adjusted earnings before interest, taxes, depreciation and amortization (adjusted EBITDA) increased 81 and 18 percent, respectively, compared with 2015; the natural gas gathering and processing segment's average fee rate increased to 76 cents in 2016, compared with 44 cents in 2015; and full-year 2016 natural gas volumes processed increased 12 percent and natural gas liquids (NGL) volumes fractionated increased 6 percent, compared with 2015.

28.     The Partnership's stock price doubled between February 2016 and January 2017 in light of its strong financial results and growth prospects, as reflected in the chart below:



29.     The inadequate Merger Consideration is the result of a flawed strategic review process.  Specifically, the Proxy indicates that the Board did not expand its search for strategic alternatives to maximize unitholder value with any entities besides ONEOK, Inc.

30.    In sum, the Merger Consideration appears to inadequately compensate ONEOK Partners unitholders, and is the result of a flawed strategic review process.  It is therefore imperative that Defendants disclose the material information they have omitted from the Proxy (discussed in detail below) to the Partnership's unitholders, so that unitholders can fully assess the fairness of the Merger Consideration for themselves and make an informed decision concerning whether or not to vote in favor of the Proposed Transaction.

**II.    The Merger Agreement's Deal Protection Provisions Deter Superior Offers**

31.    In addition to failing to conduct a fair and reasonable strategic review process, the Individual Defendants agreed to certain deal protection provisions in the Merger Agreement that operate conjunctively to deter other suitors from submitting a superior offer for the Partnership.

32.    First, the Merger Agreement contains a no solicitation provision that prohibits the Partnership or the Individual Defendants from taking any affirmative action to obtain a better deal for unitholders.  The Merger Agreement generally states that the Partnership and the Individual Defendants shall not: (i) initiate, solicit, propose or knowingly encourage or knowingly facilitate any inquiry or the making of any proposal or offer that constitutes, or would reasonably be expected to lead to, an acquisition proposal; (ii) engage in, continue or otherwise participate in any discussions or negotiations relating to any acquisition proposal; or (iii) provide any non-public information to any person in connection with any acquisition proposal.

33.    Additionally, the Merger Agreement grants ONEOK, Inc. recurring and unlimited matching rights, which provides it with: (i) unfettered access to confidential, non-public information about competing proposals from third parties which it can use to prepare a matching bid; and (ii) several days to negotiate with the Partnership, amend the terms of the Merger Agreement and make a counter-offer in the event a superior offer is received.

34.     The non-solicitation and matching rights provisions essentially ensure that a superior bidder will not emerge, as any potential suitor will undoubtedly be deterred from expending the time, cost, and effort of making a superior proposal while knowing that ONEOK, Inc. can easily foreclose a competing bid.   As a result, these provisions unreasonably favor ONEOK, Inc., to the detriment of the Partnership's public unitholders.

35.     Lastly, ONEOK Partners is subject to provisions under the Merger Agreement that, in specified circumstances, could require ONEOK Partners to pay a fee to ONEOK, Inc. of up to $300 million or require ONEOK Partners to make a payment in respect of ONEOK Inc.'s expenses up to $10.0 million.  The termination fee provision further ensures that no competing offer will emerge, as any competing bidder would have to pay a naked premium for the right to provide ONEOK Partners unitholders with a superior offer.

36.     Ultimately, these preclusive deal protection provisions restrain ONEOK Partners' ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Partnership.

37.     Given that the preclusive deal protection provisions in the Merger Agreement impede a superior bidder from emerging, it is imperative that unitholders receive all material information necessary for them to cast a fully informed vote at the special meeting concerning the Proposed Transaction.

III.     **The Materially Incomplete and Misleading Proxy**

38.     On March 7, 2017, Defendants filed the Proxy with the SEC in connection with the Proposed Transaction.  The Proxy solicits the Partnership's unitholders to vote in favor of the Proposed Transaction.  The Individual Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Partnership's unitholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy misrepresents

and/or omits material information that is necessary for the Partnership's unitholders to make an informed decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

39. First, the Proxy fails to provide material information concerning the Partnership's and ONEOK, Inc.'s financial projections. Specifically, the Proxy provides projections for various non-GAAP (generally accepted accounting principles) metrics including Adjusted EBITDA, Distributable cash flow, and cash flow available for dividends, but fails to provide line item projections for the metrics used to calculate these non-GAAP measures or otherwise reconcile the non-GAAP projections to GAAP.

40. When a company discloses information in a Proxy that includes non-GAAP financial measures, the company must also disclose comparable GAAP measures and a quantitative reconciliation of forward-looking information. 17 C.F.R. § 244.100.

41. Indeed, the SEC has recently increased its scrutiny of the use of non-GAAP financial measures in communications with shareholders. The SEC Chairwoman, Mary Jo White, recently stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as Defendants have included in the Proxy here), implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation. Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors. And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of

consistency; cherry-picking; and the use of cash per share data. I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures. I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[1]

42.    In recent months, the SEC has repeatedly emphasized that disclosure of non-GAAP projections can be inherently misleading, and has therefore heightened its scrutiny of the use of such projections.[2]  Indeed, on May 17, 2016, the SEC's Division of Corporation Finance released new and updated Compliance and Disclosure Interpretations ("C&DIs") on the use of non-GAAP financial measures that demonstrate the SEC's tightening policy.[3]  One of the new C&DIs regarding forward-looking information, such as financial projections, explicitly requires companies to provide *any* reconciling metrics that are available without unreasonable efforts. The Partnership routinely reconciles its non-GAAP figures to the most directly comparable GAAP measure in its quarterly releases[4], and it could undoubtedly do the same for the projections included in the Proxy.

---

[1] Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability*, (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html.

[2] *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

[3] *Non-GAAP Financial Measures, Compliance & Disclosure Interpretations*, U.S. SECURITIES AND EXCHANGE COMMISSION (May 17, 2016), https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm.

[4] *E.g.*, ONEOK Partners Announces Higher Fourth-Quarter And Full-Year 2016 Financial Results, (Feb. 27, 2017), http://ir.oneokpartners.com/news-and-events/press-releases/2017/02-27-2017-211628161.

43.     The Individual Defendants are also directors and/or officers of ONEOK, Inc., and they therefore have access to and the ability to disclose a reconciliation for ONEOK Inc.'s non-GAAP projections included on pages 51-52 of the Proxy as well.

44.     In order to make the non-GAAP projections on pages 51-52 of the Proxy not misleading, Defendants must disclose a reconciliation table of the non-GAAP measures to the most directly comparable GAAP measure, and/or the line item projections for the various metrics that were used to calculate the non-GAAP measures, which are set forth in footnotes 2-4 on pages 51 and 52 of the Proxy.

45.     The Proxy also fails to provide unitholders with the projections for unlevered after-tax free cash flows that each of ONEOK Partners and ONEOK, Inc. is expected to generate during the period from calendar year 2017 through the end of 2026.  Under sound corporate finance theory, ONEOK Partners unitholders would find such cash flow projections material in assessing the fairness of the Merger Consideration.  The omission of such projections renders the projections set forth on pages 51-52 of the Proxy incomplete and misleading.

46.     Indeed, financial experts agree that projections for Adjusted EBITDA, which are include in the Proxy, are not a sufficient substitute for cash flow projections when attempting to understand the value of a company.  As Warren Buffet and other financial experts have stated: "References to EBITDA make us shudder.  Too many investors focus on earnings before interest, taxes, depreciation and amortization.  That makes sense, only if you think capital expenditures are funded by the tooth fairy."[5]

---

[5]   Elizabeth   MacDonald,   *The   Ebitda   folly*,   FORBES   (March   17,   2003), http://www.forbes.com/global/2003/0317/024.html.

47.     Relying solely on Adjusted EBITDA to provide a fair summary of a company's financial prospects has numerous pitfalls.  Adjusted EBITDA does not take into account any capital expenditures, working capital requirements, current debt payments, taxes, or other fixed costs which are critical to understanding a company's value.  As a result of these material differences between EBITDA and unlevered free cash flow, many analysts recognize unlevered free cash flow as a much more accurate measure when it comes to analyzing the expected performance of a company.  Disclosing Adjusted EBITDA projections without cash flow projections is therefore inherently misleading.

48.     The omission of the unlevered free cash flow projections renders the summary of the Partnership's and ONEOK, Inc.'s projections on pages 51-52 of the Proxy incomplete and misleading.  If corporate directors and officers choose to disclose financial projections in a proxy statement, they must provide complete and accurate projections, not merely excerpts of certain sets or line items of projections.  The question here is not the duty to speak, but liability for not having spoken enough.  With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known--but it may not choose half-truths.

49.     The Proxy at page 52 also falsely states that "the following table sets forth certain projected financial information for ONEOK, ONEOK Partners *and the pro forma company* for 2016 through 2021 with respect to the flat case."  This statement is false, because the table does not contain any *pro forma* projections.  The pro forma projections under the "flat case" must be disclosed in order to make the summarized projections on page 52 of the Proxy complete and not misleading.

50.     Defendants have also failed to disclose the case of financial projections for ONEOK Partners and ONEOK, Inc. which were based on Wall Street analyst estimates through 2020 and were utilized by Barclays in connection with its valuation analyses, defined in the Proxy as the "Research Case Projections." Proxy 67.  The Research Case Projections are material to the Partnership's unitholders, as they relate directly to the value of the Partnership, the fairness of the Merger Consideration, and the legitimacy of Barclays' valuation analyses.  The omission of the Research Case Projections renders the summary of projections included on pages 51-52 of the Proxy, as well as the implied valuations Barclays calculated utilizing the Research Case Projections that are summarized on pages 69, 73, 79 and 80 of the Proxy, incomplete and misleading.  Indeed, the implied valuations that Barclays calculated utilizing the Research Case Projections are based upon various assumptions that Barclays made, and unitholders need the underlying projections in order to assess the legitimacy of Barclays' various assumptions and the resulting valuations.

51.     Defendants have also failed to disclose the amounts of estimated tax savings that will result from the Proposed Transaction, defined in the Proxy as the "Expected Synergies," and ONEOK, Inc.'s estimates of quarterly dividend growth through 2021, the anticipated impact on dividend coverage ratios, cash available for distributions to shareholders of the combined company and credit ratings (collectively, the "Expected Benefits").  Proxy 64.  The Expected Synergies and Expected Benefits were prepared by the management of ONEOK, Inc. and ONEOK Partners, and were relied upon by Barclays in connection with its valuation analyses.  *Id*.  These financial estimates are material to ONEOK Partners unitholders, as they relate directly to the value of the Partnership, the fairness of the Merger Consideration, and the legitimacy of Barclays' valuation analyses.  The omission of any information quantifying or summarizing the Expected Synergies

and the Expected Benefits renders the vague references to each in the Proxy incomplete, and renders the valuation summaries for the analyses Barclays performed utilizing the Expected Synergies and Expected Benefits incomplete and misleading. Specifically, the incomplete and misleading valuation summaries are the Discounted Cash Flow Analysis summary on page 67 of the Proxy, Selected Comparable Company Trading Analysis summary on page 72 of the Proxy, Illustrative Has-Gets Analysis summary on page 77 of the Proxy, and Pro Forma Merger Consequences Analysis summary on page 79 of the Proxy.

52. Indeed, as a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices include "the appropriate discount rate, and the terminal value…" *Id.* As Professor Davidoff explains:

> **There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars**….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. **This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion <u>unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices.</u>** The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions. *Id.* at 1577-78.

53.     With respect to Barclays' Selected Comparable Company Trading Analysis and Selected Precedent Transactions Analysis, the Proxy fails to disclose the individual multiples for each transaction and company utilized.  As a result of these omissions, unitholders are unable to assess whether Barclays applied appropriate multiples, or, instead, applied unreasonably low multiples in order to drive down the implied share price ranges.  The omission of such information renders the summaries of these valuation analyses and the implied share price ranges on pages 70-75 of the Proxy incomplete and misleading.

54.     Lastly, the Proxy fails to disclose a significant conflict of interest Barclays faced. Specifically, according to Bloomberg, Barclays currently holds 480,560 shares of ONEOK, Inc. common stock, worth approximately $25.3 million.  The value of Barclays' holdings in ONEOK, Inc. is significant, particularly compared to the $6.5 million to $8.5 million fee Barclays stands to receive in connection with the Proposed Transaction. *See* Proxy 81.  The size of Barclays' holdings in ONEOK, Inc. is material information to ONEOK Partners unitholders, as it constitutes a significant conflict of interest that may have impacted Barclays' valuation analyses.  It is imperative for the unitholders to be able to understand what factors might influence the financial advisor's analytical efforts.  A financial advisor's own proprietary financial interest in a proposed transaction must be carefully considered in assessing how much credence to give its analysis.  For that reason, the benefits of the merger to the investment banker, beyond its expected fee, must also be disclosed to the unitholders.  There is no rule that conflicts of interest must be disclosed only where there is evidence that the financial advisor's opinion was actually affected by the conflict. The omission of this information renders the vague statement on page 82 of the Proxy that Barclays "*may at any time* hold long or short positions and investments" in ONEOK, Inc. securities

misleading, because Barclays *does in fact currently hold a significant position in ONEOK, Inc. securities*.

55.     In sum, the omission of the above-referenced information renders statements in the Proxy materially incomplete and misleading, in contravention of the Exchange Act.  Absent disclosure of the foregoing material information prior to the special meeting to vote on the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make a fully-informed decision regarding whether to vote in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## <u>COUNT I</u>

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 and 17 C.F.R. § 244.100 Promulgated Thereunder)**

56.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

57.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

58.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that Proxy communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in

order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

59.    SEC Regulation G has two requirements: (1) a general disclosure requirement; and (2) a reconciliation requirement.  The general disclosure requirement prohibits "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure, contains an untrue statement of a material fact or *omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure…not misleading*."  17 C.F.R. § 244.100(b).  The reconciliation requirement requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure, and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure.  17 C.F.R. § 244.100(a).  As set forth above, the Proxy omits information required by SEC Regulation G, 17 C.F.R. § 244.100.

60.    The omission of information from a proxy statement will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

61.    Defendants have issued the Proxy with the intention of soliciting unitholder support for the Proposed Transaction.  Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) financial projections for the Partnership and ONEOK, Inc.; and (ii) the valuation analyses performed by Barclays.

62.    In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were

misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to unitholders although they could have done so without extraordinary effort.

63.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that Barclays reviewed and discussed its financial analyses with the Board and/or the conflicts committee, and further states that the Board and/or conflicts committee considered both the financial analyses provided by Barclays as well as its fairness opinion and the assumptions made and matters considered in connection therewith.  Further, the Individual Defendants were privy to and had knowledge of the projections for the Partnership and ONEOK, Inc.  The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.  Indeed, the Individual Defendants were required to review the bankers' analyses in connection with their receipt of the fairness opinions, question the bankers as to their derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

64.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required

to do carefully as the Partnership's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Partnership's and ONEOK, Inc.'s financial projections.

65.    The Partnership is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

66.    The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.  Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

67.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

68.    The Individual Defendants acted as controlling persons of the Partnership within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of the Partnership, and participation in and/or awareness of the Partnership's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Partnership, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

69.    Each of the Individual Defendants was provided with or had unlimited access to

copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

70.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Partnership, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing this document.

71.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

72.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

73.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

74.    Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate

and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.    Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.    Enjoining Defendants and all persons acting in concert with them from proceeding with the unitholder vote on the Proposed Transaction or consummating the Proposed Transaction, unless and until Defendants disclose the material information discussed above which has been omitted from the Proxy;

C.    Directing the Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

D.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses;

E.    Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: March 2, 2017

Respectfully submitted,

**LOCAL COUNSEL**

**OF COUNSEL**

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde
The Empire State Building
350 Fifth Avenue, 59th Floor
New York, NY 10118
Tel: (212) 971-1341
E-mail: jmonteverde@monteverdelaw.com

s/ Jack L. Brown, OBA 10742
C. Michael Copeland, OBA 13261
   Jones, Gotcher & Bogan, P.C.
   15 E. 5th Street, Suite 3800
   Tulsa, OK 74103
   918-581-8200

*Attorneys for Plaintiff*

*Attorneys for Plaintiff*